**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:22-cr-23-TFH** |
| **v.** | : | |
| | : | |
| **TINA LOGSDON,** | : | |
| | : | |
| **Defendant** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter.  For the reasons set forth herein, the government requests that this Court sentence Defendant Tina Logsdon to forty-five days' incarceration, thirty-six months' probation, sixty hours of community service, and $500 in restitution.

### I.    Introduction

Defendant Tina Logsdon, a forty-one-year-old convenience store manager, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in almost 2.9 million dollars in losses.[1]

Tina Logsdon pleaded guilty to one count of violating 40 U.S.C.  § 5104(e)(2)(G).  As explained herein, a sentence of forty-five days' incarceration and thirty-six moths' probation is

---

[1] Although the Statement of Offense in this matter, filed on July 20, 2022, (ECF No. 42 at ¶ 6) reflects a sum of more than $1.4 million dollars for repairs, as of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20.  That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

appropriate in this case because Tina Logsdon (1) shortly after the 2020 election, posted violent and inflammatory comments to social media that included calls for civil war and for the incoming President to be killed; (2) illegally entered the Capitol Building and stood towards the front of a crowd, facing police and chanting; (3) entered a sensitive area of the Capitol Building, specifically the lobby of Speaker Nancy Pelosi's Office; (4) boasted on social media about how she "took the Capitol" and "stopped the vote" in a video taken while she was still inside the Capitol Building; and (5) the following day, doubled-down on this rhetoric by posting online that she had "stormed the Capit[o]l" because "they wouldn't listen . . . ," expressing no remorse for her actions.

The Court must also consider that Tina Logsdon's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and disrupt the proceedings. *See United States v. Thomas Fee*, 1:21-cr-00133 (JDB), Tr. 04/01/2022 at 17 ("The defendant was an active participant in a mob assault on our core democratic values and our cherished institution. And that assault was intended by many and by the mob at large in general to interfere with an important democratic process[ ] of this country. I cannot ignore that, cannot pull this misdemeanor out of that context.") (statement of Judge Bates). The defendant's actions and those of her fellow rioters enabled the breach of the Capitol, threatened the lives of the police officers, legislators and their staffs, and disrupted the certification vote for several hours. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan). Here, the facts of and circumstances of Logsdon's crime support a sentence of forty-five days' incarceration and thirty-six months' probation.

## II.    Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 42 (Statement of Offense), at ¶¶ 1– 7.  As this Court knows, a riot cannot occur without rioters, and each rioter's actions—from the most mundane to the most violent— contributed, directly and indirectly, to the violence and destruction of that day.  With that backdrop we turn to Logsdon's conduct and behavior on January 6.

*Defendant Tina Logsdon's Role in the January 6, 2021 Attack on the Capitol*

On January 5, 2021, Tina Logsdon and her husband, Christopher Logsdon, traveled from their home in Sesser, Illinois, to Maryland, via automobile.  On January 6, 2021, Tina and Christopher Logsdon completed their journey to Washington, D.C., and attended the "Stop the Steal" rally.

After leaving the rally, Tina Logsdon and Christopher Logsdon entered the Capitol through a side door.  They subsequently went to the Crypt North Lobby at approximately 2:21 p.m.  At approximately 2:28 p.m., the Logsdons walked through the House Wing Door, at the front of the crowd, chanting with their fists raised, towards police officers.  *See* Image 1, below (unless otherwise indicated, the Logsdons appear inside the red circles in all the photos in this memorandum).



Image 1

The Logsdons then returned to the House Wing Door hallway at roughly 2:29 p.m. and stopped to look outside one of the hallway's windows.  *See* Image 2, below.



Image 2

From the House Wing Doors, Tina and Christopher Logsdon proceeded through the

Memorial Door at approximately 2:33 p.m.  *See* Image 3, below.



Image 3

The Logsdons then proceeded to a sensitive area of the Capitol Building, specifically the lobby by the Speaker's Office.  *See* Image 4 below (the Logsdons are identified by arrows).



Image 4

At 2:36 p.m., the Logsdons proceeded to the Capitol Visitor's Center through the Crypt Lobby East.  *See* Image 5, below.



Image 5

While in the Visitor's Center, the Logsdons filmed a video. In the video, taken from Tina Logsdon's Facebook account, she holds a "Don't Tread on Me" flag while she and Christopher Logsdon have the following exchange:

Christopher Logsdon: "I'm doing video.  Welcome to the Capitol, folks.  We just stormed it."

Tina Logsdon: "We took the Capitol.  We stopped the vote.  Trump 2020, you guys." *See* Image 6, below.



Image 6

At approximately 2:50 p.m., the Logsdons left the Visitor's Center.  They then departed

the Capitol through the Rotunda Door at approximately 2:51 p.m., after spending approximately

30 minutes inside the building.  *See* Images 7 and 8, below.



Image 7



Image 8

*Social Media Posts*

In the weeks leading up to the January 6th attack, Tina Logsdon posted violent and inflammatory comments on her Facebook that included calls for civil war and for the incoming President to be killed.  On November 5, 2020, she posted, "I have a feeling if they dont [sic] make this all right there will be a civil war like no other.  #Trump2020."  A few days later, on November 8, 2020, Tina Logsdon posted "You can not [sic] tell me that over half the USA voted for this pedophile. . . .  He def dont [sic] need to be President he really needs to be hanging by the neck from the nearest tree.  Pedophile style.  With two in the head.  Sorry not sorry."

After the attack on the Capitol, Tina Logsdon posted on her Facebook account on January 7, 2021, saying "It was Trump supports who stormed the Capital I was one of them.  Enough is enough it is time we as Americans take a stand, and what better way then to clean house.  [sic]."  She additionally posted, "Yes we stormed the capitol.  We tried to do it peacefully but they wouldn't listen maybe now they will.  [sic]."

*Tina Logsdon's Post-arrest Interview with the FBI*

On March 31, 2021, Tina Logsdon and Christopher Logsdon gave a voluntary post-arrest interview to the FBI at the time that a search warrant was executed at their home in Sesser, Illinois. During her interview, Tina Logsdon admitted to travelling to Washington, D.C.  She told investigators that she was present in the Capitol for fifteen to twenty minutes.  During that time, she heard what she believed to be the sound of three gunshots over police radios.  She specifically said that it was her idea to enter the Capitol.  At the time of her interview, she said that she did not believe that what she did was wrong.

Christopher Logsdon was also interviewed on March 31, 2021.  In his interview, he told agents that he saw people pulling up fencing outside the Capitol, which the people then used as a ladder to access the second floor of the building.

*The Charges and Plea Agreement*

On January 18, 2022, the United States charged Tina Logsdon by information with violating 18 U.S.C. § 1752(a)(1), 18 U.S.C. § 1752(a)(2), 40 U.S.C. § 5104(e)(2)(D), and 40 U.S.C. § 5104(e)(2)(G).  On July 20, 2022, pursuant to a plea agreement, Tina Logsdon pleaded guilty to Count Four of the Information, charging her with a violation of 40 U.S.C. § 5104(e)(2)(G).  By plea agreement, she agreed to pay $500 in restitution to the Department of the Treasury.

### III.    Statutory Penalties

Tina Logsdon now faces a sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G).  As noted by the plea agreement and the U.S. Probation Office, she faces up to six months of imprisonment and a fine of up to $5,000.  She must also pay restitution under the terms of her plea agreement.  *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072,

1078-79 (D.C. Cir. 2008).  As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it.  18 U.S.C. § 3559; U.S.S.G. § 1B1.9.

**IV.     Sentencing Factors Under 18 U.S.C. § 3553(a)**

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence.  Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6).  In this case, as described below, the Section 3553(a) factors weigh in favor of a sentence of forty-five days of incarceration and thirty-six months of probation, 60 hours of community service, and $500 in restitution.

**A.     The Nature and Circumstances of the Offense**

The attack on the U.S. Capitol, on January 6, 2021 was a crime unparalleled in American history and defies comparison to other violent riots.  It represented a grave threat to our democratic norms and practices.  Indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants.

While each defendant must be sentenced based on their own conduct, this Court should take into account that each person who entered the Capitol on January 6 without authorization did so under extreme circumstances.  As they entered the Capitol, they very likely crossed through numerous barriers and barricades and heard the violent outcries of a mob.  Depending on the timing

and location of their approach, they also may have observed extensive fighting between the rioters and police and smelled chemical irritants in the air.  No rioter was a mere tourist that day.

Additionally, while assessing defendant Tina Logsdon's individual conduct and fashioning a just sentence, this Court should look to a number of critical aggravating and mitigating factors, including: (1) whether, when, and how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) defendant's reaction to acts of violence or destruction; (5) whether, during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from police officers; and (9) whether the defendant demonstrated sincere remorse or contrition.  While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.  Had Logsdon personally engaged in violence or destruction, she would be facing additional charges and/or penalties associated with that conduct.  The absence of violent or destructive acts on the part of Logsdon is therefore not a mitigating factor in misdemeanor cases.

Tina Logsdon was prepared for violence when she traveled to Washington, D.C.  Her Facebook posts indicate that she was anticipating potential violence, including a "civil war like no other."  Once inside the Capitol, she was chanting while at the front line of a crowd that followed the police as the police moved away from the rioters.  According to her own interview, she believed that she heard shots fired in the Capitol.  Although she was not directly involved in any physical altercation with police officers, the fact that she was present at the very front of a crowd that encountered the police moving away from protesters demonstrates that she knew that she was in the Capitol unlawfully and the police had no choice but to move away from the violent rioters.

She then proceeded to various areas of the Capitol Building, including the lobby of the Speaker's Office, a sensitive area.

Despite all of this evidence indicative of a violent takeover of the Capitol, Tina Logsdon still posted on her Facebook account bragging about being at the Capitol and claiming that she had tried to protest peacefully. The fact that she posted the video from within the Visitor Center, in which she said that she had just taken the Capitol and "stopped the vote" clearly establishes her reason for rioting in the Capitol. She willfully intended to disrupt the democratic process in certifying the results of the 2020 election.

After the Capitol Riot, Tina Logsdon explained on Facebook that peopled stormed the capitol because "we just wanted them to hear us and to be *warned* that if we have to come back *we will be coming for them*." (emphasis added). This statement illuminates her intent on January 6th, but also reveals the potential for future violence from this defendant. Several weeks before the riot, Tina Logsdon also made reference to the start of a potential "civil war" and a desire that the President be "hang[ed] by the neck from the nearest tree." Even at the time of her March 31, 2021 interview, Tina Logsdon told the interviewing agents that she did not believe that what she did was wrong. Logsdon's own words demonstrate a very real possibility of future violence, which compels the government to seek a sentence of forty-five days' incarceration and thirty-six months' probation in this case.

**B.** **The History and Characteristics of Logsdon**

As set forth in the PSR, Tina Logsdon's criminal history consists of a misdemeanor conviction for Possessing/Consuming Liquor by a Minor and several traffic infractions. ECF 44 ¶¶ 28–34. She has been compliant with her conditions of pre-trial release. *Id.* ¶ 9. Despite not

having a serious criminal history, her actions during the January 6th Riot and her lack of remorse indicate a need for a sentence that provides specific deterrence, as discussed further below.

### C.      The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law.  "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[2]  As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot.  *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation.  I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.      The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant.  18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

#### General Deterrence

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol.  Indeed, general deterrence may be the most

---

[2] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

compelling reason to impose a sentence of incarceration.  "Future would-be rioters must be deterred."  (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration, because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.  As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [[Defendant Last Name]] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70.  Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation."  *Id.* at 70.

The gravity of these offenses demands deterrence.  This was not a protest.  *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss).  And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences.  There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

As more fully discussed above, the facts of this case, including Logsdon's violent rhetoric before and after the Capitol attack, as well as her simultaneous attempts to minimize the

16

violence that took place on that day and her lack of remorse, strongly weigh in favor of a sentence that will specifically deter Tina Logsdon from participating in any potential future violence.  Her post-January 6 social media posts and FBI interview indicate that she may be inclined to engage in similar unlawful conduct in the future..  Specifically, the government believes it necessary that the sentence imposed deter her from attempting to unlawfully or violently interfere in any future democratic elections.

### E.      The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[3]  This Court must sentence Logsdon based on her own conduct and relevant characteristics, but should give substantial weight to the context of her unlawful conduct: her participation in the January 6 riot.  Although those like Logsdon convicted of misdemeanors are generally less culpable than defendants convicted of felonies, misdemeanor breaches of the Capitol on January 6, 2021, were not minor crimes.  A probationary sentence should not be the default.[4]  *See United States v. Anna*

---

[3]  Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[4]  Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation, including in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); and *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC).  The government is abiding by its agreements in those cases, but has made no such agreement in this case.  *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

*Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19 ("I don't want to create the impression that probation is the automatic outcome here because it's not going to be.") (statement of Judge Lamberth at sentencing).   Accord, *United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 (statement of Judge Friedman).

Tina Logsdon has pleaded guilty to Count Four of the Information, charging her with parading, demonstrating, or picketing in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(G).  This offense is a Class B misdemeanor.  18 U.S.C. § 3559.  Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9.  The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.  Avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement.  *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly."  *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009).  *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").   Because the

Sentencing Guidelines do not apply here, the sentencing court cannot readily conduct a disparity analysis against a nationwide sample of cases captured by the Sentencing Guidelines.

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against police officers, and large number of victims. Thus, even though many of defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

- Philip Weisbecker, 1:21-CR-00682-TFH (this Court imposed **30 days' intermittent confinement** as a condition of 2 years' probation where the defendant, among other things, penetrated the Capitol all the way to the Speaker's Office, wandered through restricted hallways and into the Rotunda where he took photographs of himself, posted statements on social media which demonstrated a total lack of remorse, and was verbally abusive towards officers);

- Jeremiah Caplinger, 1:21-CR-00342-PLF (the court imposed **35 days of confinement** and 24 months' probation where the defendant, among other things, penetrated the Capitol all the way to sensitive spaces, including the suite of offices belonging to Speaker Pelosi on the second floor; the defendant's statements on social media and in the news on and after January 6, 2021 revealed a lack of remorse; in a post-January 6 FBI interview, the defendant omitted information and repeatedly downplayed his actions);

- Lawrence Stackhouse, 1:21-CR-00240-BAH (the court imposed **14 days' intermittent confinement** as a condition of 36 months' probation where the defendant, among other things, entered and remained in the Capitol Building for approximately 20 minutes; traveled throughout the Capitol, including through the Crypt and Rotunda, eventually reaching the lobby of the Speaker's Office; briefly entered the Speaker's Office; blamed the police who sought to protect the Capitol on January 6 for "bringing violence on themselves; and stated, in the immediate aftermath of the riot, "Don't regret one thing" and "Fuck the government");

- *United States v. Richard Watrous*, 1:21-CR-00627-BAH (the court imposed **14 days' intermittent confinement**, 2 months' home confinement, and 30 months' probation where defendant, among other things, took a photo of a damaged window by the Upper House Door, then entered the Capitol Building and stayed for five minutes, watched as another rioter stole wine reportedly from Speaker Pelosi's Office, defendant reentered the Capitol Building despite seeing those things that should have given him misgivings, and minimized his conduct when interviewed by the FBI);

- Jeremy Sorvisto, 1:21-CR-00320-ABJ (the court imposed **30 days' incarceration** where the defendant took a similar path through the Capitol as that taken by Tina Logsdon, was among the first in the Capitol, destroyed evidence, and expressed no remorse for his actions); and

- Oliver Sarko, 1:21-CR-00591-CKK (the court imposed **30 days' incarceration**, and 36 months' probation where the defendant, among other things, proudly recorded himself outside of the Capitol, exclaiming "We are storming the Capitol out here," "Where are the traitors," "Bring out Pelosi!" "We won't let you steal this country," "We're actually breaking in right now," and "Fight for Trump!"; entered sensitive spaces, including the office of Senator Jeff Merkley, without authorization; and chanted and cheered while approaching the U.S. Capitol and posted a video to Snapchat of his conduct inside and outside of the Capitol).

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v.*

*Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.     This Court's Authority to Impose a Sentence of Up to 14 Days of Imprisonment and Probation.

As eight judges of this District have now concluded, this Court has the authority under 18 § 3561(a)(3) to impose a "split sentence," *i.e.*, a sentence requiring both a term of imprisonment and a term of probation, on a defendant who has been convicted of a "petty offense." *See, e.g.*, *United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that " a split sentence is permissible under law and warranted by the circumstances of this case), *appeal pending*, D.C. Circuit No. 22-3018; *United States v. Sarko*, No. 21cr591 (CKK), 2022 WL 1288435, at *1 (D.D.C. Apr. 29, 2022) (explaining why a split sentence is permissible in a petty offense case); *United States v. Caplinger*, No. 21cr342 (PLF), 2022 WL 2045373, at *1 (D.D.C. June 7, 2022) ("the Court concludes that a split sentence is permissible for a petty offense and therefore is an option for the Court in Mr. Caplinger's case."); *United States v. Smith*, 21cr290 (RBW), ECF 43 (D.D.C. Mar. 15, 2022) (imposing split sentence); *United States v. Meteer*, 21cr630 (CJN), ECF 37 (D.D.C. April 22, 2022) (same); *United States v. Entrekin*, 21cr686 (FYP), ECF 34 (D.D.C. May 6, 2022) (same); *United States v. Revlett*, 21cr281 (JEB), ECF 46 (D.D.C. July 7, 2022) (same); *United States v. Getsinger*, 21cr607 (EGS), ECF 60 (D.D.C. July 12, 2022) (same); *United States v. Ticas*, 21cr601 (JDB), ECF 40 (D.D.C. July 15, 2022) (same); *United States v. Caplinger*, 21cr342 (PLF), ECF 74 (D.D.C. August 1, 2022) (same).[5]  This Court should

---

[5] In *United States v. Lindsey*, 21-cr-162 (BAH), ECF 102, the defendant pleaded guilty to three counts: 18 U.S.C. § 1752(a)(1); 40 U.S.C. §§ 5104(e)(2)(D) and 5104(e)(2)(G). Chief Judge

follow suit and sentence Logsdon to forty-five days' incarceration and thirty-six months' probation.

But this Court need not decide that question in this case because there is no dispute that such a defendant can be required to "remain in the custody of the Bureau of Prisons during nights, weekends, or other intervals of time, totaling no more than the lesser of one year or the term of imprisonment authorized for the offense, during the first year of the term of probation or supervised release." 18 U.S.C. § 3563(b)(10). Congress enacted this provision to give sentencing courts "flexibility" to impose incarceration imprisonment as a condition of probation in one of two ways. S. Rep. No. 225, 1983 WL 25404, at *98. First, a court can direct that a defendant be confined in "split intervals" over weekends or at night. *Id.* Second, a sentencing court can impose "a brief period of confinement" such as "for a week or two." *Id.*

Although the statute does not define an "interval of time," case law suggests that it should amount to a "brief period" of no more than a "week or two" at a time. *See United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history in interpreting the term to mean a "brief period of confinement, *e.g.*, for a week or two, during a work or school vacation," described above and reversing magistrate's sentence that included 30-day period of confinement as a period condition of probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18, 2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation was inconsistent with Section 3563(b)(10)); *see also United States v. Anderson*, 787 F. Supp. 537, 538 (D. Md. 1992) (continuous 60-day incarceration not appropriate as a condition of probation). A fourteen-day

---

Howell sentenced Lindsey to five months incarceration on each of the § 5104 counts, to be served concurrently, and 36 months' probation on the § 1752(a)(1) count.

term of imprisonment is therefore permissible under Section 3563(b)(10).  S*ee United States v. Stenz*, 21-cr-456 (BAH) ECF 38 (D.D.C. Feb. 17, 2022) (imposing imprisonment under Section 3563(b)(10); *United States v. Schornak*, 21-cr-278 (BAH) ECF 71 (D.D.C. Feb. 18. 2022) (same); *United States v. Herendeen*, 21-cr-278 (BAH) ECF 87 (D.D.C. Apr. 1, 2022) (same); *United States v. McCreary*, 21-cr-125 (BAH) ECF 46 (D.D.C. Apr. 1, 2022) (same); *United States v. Reed*, 21-cr-204 (BAH) ECF 178 (D.D.C. Apr. 14, 2022) (same); *United States v. Watrous*, 21-cr-627 (BAH) ECF 40 (D.D.C. Apr. 21, 2022) (same); *United States v. Vuksanaj*, 21-cr-620 (BAH) ECF D.D.C. Apr. 29, 2022) (43 (same); *United States v. Heinl*, 21-cr-370 (EGS) ECF 43 (D.D.C. June 8, 2022) ECF 43  (same); *United States v. Cameron*, 22-cr-00017 (TFH) ECF 36 (D.D.C. Aug. 17, 2022) (same).

No court appears to have decided whether a term of continuous imprisonment greater than two weeks, but less than 30 days, is consistent with Section 3563(b)(10), and the government does not advocate such a sentence here.  Practical concerns with multiple short terms of intermittent confinement (i.e., nights and weekends in jail), which would require repeated entries and departures from a detention facility during the COVID-19 pandemic, thereby increasing the risk of spreading contagion in the facility, may militate against imposing this type of "intermittent" confinement.

## VI.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors.  Balancing these factors, the government recommends that this Court sentence Defendant Tina Logsdon to forty-five days' incarceration, thirty-six months' probation, sixty hours of community service, and $500 in restitution.  Such a sentence protects the community, promotes respect for the law, and deters

future crime by imposing restrictions on his liberty as a consequence of her behavior, while recognizing her acceptance of responsibility for her crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:      s/ *Thomas Campbell*
Thomas D. Campbell
Trial Attorney
Criminal Division, Fraud Section
U.S. Department of Justice
1400 New York Ave. NW
Washington, DC 20005
Tel: (202) 262-7778
Email: thomas.campbell@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

On this 21st day of October, 2022, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.


By:     <u>s/ *Thomas Campbell*</u>
        Thomas D. Campbell
        Trial Attorney
        Criminal Division, Fraud Section
        U.S. Department of Justice
        1400 New York Ave. NW
        Washington, DC 20005
        Tel: (202) 262-7778
        Email: thomas.campbell@usdoj.gov